**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **NINA JANKOWICZ,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 23-513-CFC |
| | : | |
| **FOX NEWS NETWORK, LLC**, and **FOX CORPORATION**, | : | |
| | : | |
| Defendants. | : | |
| | : | |

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**OF COUNSEL:**

Eric M. George (*pro hac vice*)
Patrick F. Philbin (*pro hac vice*)
Katherine A. Petti (*pro hac vice*)

**ELLIS GEORGE CIPOLLONE O'BRIEN LLP**
2121 Avenue of the Stars, Suite 3000
Los Angeles, California 90067
(310) 274-7100
(310) 275-5697 (Fax)

1155 F Street, NW, Suite 750
Washington, DC 20004
(202) 249-6900
(202) 249-6899 (Fax)

egeorge@egcfirm.com
pphilbin@egcfirm.com
kpetti@egcfirm.com

August 31, 2023

**DLA PIPER LLP (US)**
John L. Reed (I.D. No. 3023)
Peter Kyle (I.D. No. 5918)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone (302) 468-5700
Facsimile (302) 394-2341
john.reed@us.dlapiper.com
peter.kyle@us.dlapiper.com

*Attorneys for Fox News Network, LLC, and Fox Corporation*

# TABLE OF CONTENTS

                                                                          **Page**

NATURE AND STAGE OF THE PROCEEDINGS ................................................1

SUMMARY OF THE ARGUMENT ........................................................................1

STATEMENT OF FACTS ..........................................................................................4

    A.    The "Disinformation Governance Board" ...........................................4

    B.    Plaintiff Is Made Head of the Disinformation Board...........................5

    C.    Public Reaction.....................................................................................6

    D.    Plaintiff's Lawsuit ...............................................................................9

    E.    The Preliminary Injunction in *Missouri v. Biden*...............................10

LEGAL STANDARD................................................................................................10

ARGUMENT ............................................................................................................11

I.      PLAINTIFF FAILS TO STATE A CLAIM FOR DEFAMATION..............11

    A.    Plaintiff Cannot Claim Defamation for Statements About the
        Disinformation Board, DHS, or the Administration. ..........................12

    B.    Plaintiff's Claims All Fail Because They Attack Statements of
        Opinion Protected Under the First Amendment. ................................14

        1.    Context Shows the Statements Were Opinions. ......................15

        2.    The Challenged Statements Are Opinions Because They
              Are Predictions and Assertions About Motives,
              Intentions, and Future Actions................................................17

        3.    The Challenged Statements Have No Precise Meaning. ..........19

        4.    The Language Used Demonstrates the Statements Are
              Opinions. ..................................................................................21

C.      Plaintiff's Claims Fail Because the Challenged Statements Were Substantially True....................................................................21

    1.      Predictions of Censorship Were Substantially True.................22

    2.      It Was Substantially True That Plaintiff Was "Booted," "Yank[ed]," or "Fired."..............................................................25

    3.      It Is Substantially True that Plaintiff Endorsed Having the Ability to "Edit" Others' Tweets. ........................................26

D.      Plaintiff Fails To Allege Facts Showing Actual Malice. ....................27

II.      CLAIMS BASED ON ANY STATEMENT MADE BEFORE MAY 10, 2022 ARE TIME BARRED. ....................................................................33

III.      THE FAC SHOULD BE DISMISSED UNDER THE HEIGHTENED STANDARD OF NEW YORK'S ANTI-SLAPP STATUTE. .....................33

IV.      PLAINTIFF FAILS TO PLEAD ANY FACTS AS TO FOX CORPORATION. .........................................................................................35

CONCLUSION .................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Loksen*,
   239 F.3d 256 (2d Cir. 2001) .................................................................2, 11

*Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
   435 F.3d 396 (3d Cir. 2006) ....................................................................5

*Andrews v. Stallings*,
   892 P.2d 611 (N.M. Ct. App. 1995) .......................................................13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................10, 27

*Biro v. Conde Nast*,
   807 F.3d 541 (2d Cir. 2015) ..................................................................27

*Biro v. Conde Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012) ...............................................21, 37

*Biro v. Conde Nast*,
   963 F. Supp. 2d 255 (S.D.N.Y. 2013) ...................................................32

*Carroll v. Trump*,
   590 F. Supp. 3d 575 (S.D.N.Y. 2022) ...................................................34

*Celle v. Filipino Rep. Enters. Inc.*,
   209 F.3d 163 (2d Cir. 2000) ..................................................................14

*Chau v. Lewis*,
   935 F. Supp. 2d 644 (S.D.N.Y. 2013) ...................................................14

*City of Newark v. Delmarva Power & Light Co.*,
   497 F. Supp. 323 (D. Del. 1980).............................................................10

*Condit v. Dunne*,
   317 F. Supp. 2d 344 (S.D.N.Y. 2004) ......................................................5

*Cummings v. City of New York*,
No. 19-CV-7723-CM-OTW, 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020) ..................................................................................17

*DuBose v. Wyndham Vacation Resorts, Inc.*,
No. 20-1118-CFC, 2021 WL 3145206 (D. Del. Jul. 26, 2021) .........................33

*Dworkin v. L.F.P., Inc.*,
839 P.2d 903 (Wyo. 1992).................................................................19

*Eliott v. Lions Gate Entertainment Corp.*,
No. 2:21-cv-08206-SSS-DFMx, 2022 WL 17408662 (C.D. Cal. Nov. 8, 2022) ..................................................................................5

*Fairbanks Pub. Co. v. Pitka*,
445 P.2d 685 (Alaska 1968) .............................................................26

*Fairfax v. CBS Corporation*,
2 F.4th 286 (4th Cir. 2021) ..............................................................32

*Ford-Greene v. NHS, Inc.*,
106 F. Supp. 3d 590 (E.D. Pa. 2015).................................................32

*Fudge v. Penthouse Int'l, Ltd.*,
840 F.2d 1012 (1st Cir. 1988)..........................................................16

*Ganske v. Mensch*,
480 F. Supp. 3d 542 (S.D.N.Y. 2020) ..............................................21

*Godin v. Schencks*,
629 F.3d 79 (1st Cir. 2010)..........................................................34, 35

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989)....................................................................28, 29

*Henry v. Lake Charles Am. Press, L.L.C.*,
566 F.3d 164 (5th Cir. 2009) ...........................................................35

*Hotel St. George Assocs. v. Morgenstern*,
819 F. Supp. 310 (S.D.N.Y. 1993) ..................................................33

iv

*Immuno AG. v. Moor-Jankowski*,
   549 N.E.2d 129 (N.Y. 1989) ..................................................................17

*Jacob v. Lorenz*,
   626 F. Supp. 3d 672 (S.D.N.Y 2022) ......................................................4

*Janklow v. Newsweek, Inc.*,
   788 F.2d 1300 (8th Cir. 1986) .........................................................18, 19

*King v. Globe Newspaper Co.*,
   512 N.E.2d 241 (Mass. 1987) ...............................................................18

*Lohrenz v. Donnelly*,
   223 F. Supp. 2d 25 (D.D.C. 2002) .........................................................29

*Mann v. Abel*,
   885 N.E.2d 884 (N.Y. 2008) .................................................................14

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) ................................................................22, 25, 31

*McCafferty v. Newsweek Media Grp., Ltd.*,
   955 F.3d 352 (3d Cir. 2020) ...........................................................28, 31

*McDougal v. Fox News Network, LLC*,
   489 F. Supp. 3d 174 (S.D.N.Y. 2020) ...............................................15, 16

*McFarlane v. Esquire Magazine*,
   74 F.3d 1296 (D.C. Cir. 1996) ...............................................................27

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990) .............................................................................14, 21

*Missouri v. Biden*,
   3:22-cv-01213-TAD-KDM, 2023 WL 4335270 (W.D. La. July 4,
   2023) ..........................................................................................10, 24, 30

*Missouri v. Biden*,
   3:22-cv-01213-TAD-KDM (W.D. La. May 5, 2023), ECF No.1 ..............*passim*

*Missouri v. Biden*,
   3:22-cv-01213-TAD-KDM (W.D. La. May 5, 2023), ECF No. 268 ................30

v

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971)..................................................................................30

*New York Times v. Sullivan*,
  376 U.S. 254 (1964)...............................................................2, 3, 12, 17

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co. Inc.*,
  190 F.3d 963 (9th Cir. 1999) ...............................................................35

*Ollman v. Evans*,
  750 F.2d 970 (D.C. Cir. 1984)..............................................................16

*Pace v. Baker-White*,
  850 F. App'x 827 (3d Cir. 2021) ....................................................27, 28

*Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.*,
  804 F.3d 59 (1st Cir. 2015).................................................................26

*Patterson v. K&L Distributors, Inc.*,
  972 F.2d 1341 (9th Cir. 1992) ............................................................26

*Price v. Viking Penguin, Inc.*,
  881 F.2d 1426 (8th Cir. 1989) ............................................................16

*Rappaport v. VV Pub. Corp.*,
  163 Misc. 2d 1, 9 (N.Y. Sup. Ct. 1994)...............................................17

*Rappaport v. VV Pub. Corp.*,
  223 A.D.2d 515 (N.Y. App. Div. 1996) ..............................................17

*Rosenblatt v. Baer*,
  383 U.S. 75 (1966)........................................................................11, 13

*Sandals Resorts Int'l. Ltd. v. Google, Inc.*,
  86 A.D.3d 32 (N.Y. App. Div. 2011) ..................................................15

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010).............................................................................34

*Sheindlin v. Brady*,
  597 F. Supp. 3d 607 (S.D.N.Y. 2022) .................................................14

*Smartmatic USA Corp. v. Fox Corp.*,
   213 A.D.3d 512 (N.Y. App. Div. 2023) ............................................35

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)............................................................................28

*Steinhilber v. Alphonse*,
   501 N.E.2d 550 (N.Y. 1986).................................................5, 15, 19

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017) .....................................................22, 27

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987)..........................................................32

*United States v. Bestfoods*,
   524 U.S. 51 (1998)..............................................................................36

*Vanderklok v. United States*,
   868 F.3d 189 (3d Cir. 2017) ...............................................................4

*W. Virginia State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943).............................................................................1

*White v. Hon Co.*,
   520 F. App'x 93 (3d Cir. 2013) ........................................................37

**Statutes**

Del. Code tit. 10, § 8119 .........................................................................33

Del. Code tit. 10, § 8121 .........................................................................33

N.Y. Civ. Rights § 76-a(a)(2) .................................................................34

Va. Code § 8.01-247.1 ..............................................................................33

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................34, 35

Fed. R. Civ. P. 12(f).................................................................................32

N.Y. C.P.L.R. § 215(3) .........................................................................33

N.Y. C.P.L.R. § 3211(g)(1) ...........................................................33, 34, 35

**Other Authorities**

*Video: Meet Biden's Cringey 'Disinformation' Czar*, The Washington
   Free Beacon, https://tinyurl.com/bdhc6thu (April 29, 2022) .............................8

Matthew Harwood *Government attempts to label speech misinformation,
   disinformation, and malinformation are a free-speech nightmare*,
   FIRE, https://www.thefire.org/news/government-attempts-label-
   speech-misinformation-disinformation-and-malinformation-are-free
   (November 21, 2022) ..........................................................................24

Laurence H. Tribe, *American Constitutional Law* § 12–12 (2d ed. 1988)..............13

S. 4191, 117th Cong. § 2(2) (2022) ........................................................7

*WATCH: Biden's New Disinformation Czar Sings Cringeworthy Mary
   Poppins Edition About Misinformation*, Mediaite,
   https://tinyurl.com/yezvhxev (April 29, 2022) ....................................8

## NATURE AND STAGE OF THE PROCEEDINGS

After Defendants removed this defamation action (D.I.1) and moved to dismiss (D.I.19), Plaintiff filed a First Amended Complaint ("FAC"). (D.I.26).

## SUMMARY OF THE ARGUMENT

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). When the government appeared to jettison that inviolable rule by establishing a Disinformation Governance Board ("Disinformation Board") with Plaintiff in charge, the outcry was swift. Senators, Members of Congress, State Attorneys General, and commentators all denounced government censorship. Two States sued the federal government—and Plaintiff—alleging censorship.

Opinion hosts on Fox exercised their First Amendment rights to join the debate and voiced their opinions and predictions that the Board and Plaintiff would become arbiters of truth and thereby censor speech.

Apparently oblivious to the irony, Plaintiff brought this defamation action to censor Fox—for saying that Plaintiff would censor speech. After Fox's motion to dismiss highlighted multiple fatal defects in the original complaint, Plaintiff amended—but largely to add irrelevant allegations about conduct in an unrelated lawsuit that does nothing to remedy the defects in her claims. Her lawsuit remains

1

a broadside attack on First Amendment principles.  In criticizing the government's Disinformation Board and Plaintiff's appointment while warning about censorship, Fox speakers were engaging in core political speech.  Permitting Plaintiff's defamation claims to proceed would trample on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

Plaintiff's claims fail as a matter of law.

First, more than a third of the statements Plaintiff challenges were not about Plaintiff, but about the Disinformation Board or the Biden Administration.  Plaintiff cannot claim defamation for statements that were not "of and concerning" her. *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001).  And she certainly cannot use impersonal criticism of the government as the basis for defamation.  No action lies for defaming a government agency, and there "is no legal alchemy" by which government officials can "transmut[e] criticism of government" into criticism of themselves and thus plead defamation.  *Sullivan*, 376 U.S. at 291–92.  Permitting defamation claims for statements about the Board would stifle debate about the government itself, which lies at the heart of First Amendment protections.

Second, the statements Plaintiff challenges were expressions of opinion that the First Amendment protects. Everything from the context in which they were made (commentary shows addressing a public policy controversy), to the fact that they involved predictions about the intentions and future conduct of government officials (which cannot be proved true or false), to the language used (rhetorical hyperbole and vigorous epithets) demonstrates that they were opinions.

Third, to the extent the challenged statements asserted any facts, they were substantially true. As twenty State Attorneys General explained, a government board branding certain speech "disinformation" would necessarily chill speech in a way that amounts to a form of censorship. Plaintiff did endorse a feature that would allow her to edit others' tweets. And given that the entire Disinformation Board was put on hold (thus eliminating her job) the same day she resigned, it was substantially true to say that she "had to go" or got "yank[ed]."

Fourth, Plaintiff fails to allege facts showing "actual malice"—*i.e.*, that Fox speakers knew their statements were false or acted with reckless disregard for the truth. *Sullivan*, 376 U.S. at 279–80. Plaintiff's complaints about insufficient investigation and ill will fail as a matter of law to allege actual malice and her new allegations about Fox speakers in a different case are irrelevant.

## STATEMENT OF FACTS

### A.    The "Disinformation Governance Board"

On April 27, 2022, several weeks after it had created a Disinformation

Governance Board ("Disinformation Board") in secret within the Department of

Homeland Security (DHS), the Biden Administration acknowledged the existence

of the Board.  FAC  ¶¶22, 34.  After weeks of public speculation, Senators Chuck

Grassley and Josh Hawley released documents from a whistleblower including what

Plaintiff acknowledges is the "charter" of the Disinformation Board.  *Id.* ¶¶87-89.

In those documents, DHS found that the "spread of disinformation presents serious

homeland security risks."  Ex.1 at 1.[1]  Near the top of the list: "Disinformation

related to the origins and effects of COVID-19 vaccines or the efficacy of masks."

*Id*.  The documents explained that "DHS should not attempt to be an *all-purpose*

arbiter of truth in the public arena" (emphasis added) but "should instead focus its

efforts on disinformation impacting DHS core missions," *id.* at 2, thus limiting its

role as "arbiter of truth" to those areas.  The charter signed by the Secretary of DHS

made the Disinformation Board "the central forum" for "coordination" of

---

[1] Because the FAC quotes and discusses these documents, *see, e.g.*, ¶¶12, 87–94, 97, they are attached as Ex.1.  The Court may consider them because they are incorporated by reference in the FAC, *see, e.g.*, *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 684 (S.D.N.Y 2022), and they are government documents available on a government website, *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017).

"operational responses and other efforts to counter" disinformation, including serving as DHS's "external point of contact for coordination with … the private sector." Ex.1 at 10–11.

## B. Plaintiff Is Made Head of the Disinformation Board

Plaintiff became Executive Director of the Disinformation Board on March 2, 2022, FAC ¶22, weeks before her role became public.   A self-described "internationally recognized expert in disinformation," *id.* at ¶21*,* Plaintiff has a history of public statements about regulating speech.   She testified in the UK Parliament in favor of legislation "mak[ing] illegal … [content] online where people are being harassed."   Ex.2 at 4;[2] *see also* Ex.3 at 7, 11–12, 16, 32.   She has also opposed "free speech absolutists" running online platforms, because she believes platforms should do more to suppress content she views as harassing, Ex.2 at 4, and she has argued that we "need law enforcement and our legislatures to do more" to regulate content as well, *id.*

---

[2] In addition to matters of public record, on this motion the Court may take judicial notice of newspaper articles "to indicate what was in the public realm at the time," *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006), and to illustrate "the broader social context" in which statements were made, *Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) (noticing newspaper articles on motion to dismiss defamation claim); *see also, e.g.*, *Eliott v. Lions Gate Entertainment Corp.*, No. 2:21-cv-08206-SSS-DFMx, 2022 WL 17408662, at *3 (C.D. Cal. Nov. 8, 2022) (same); *cf. Steinhilber v. Alphonse*, 501 N.E.2d 550, 554 (N.Y. 1986) ("broader social context" is relevant on whether a statement was an opinion).

Plaintiff is also a "long-time musical theater fan" and posted a video of herself singing a "disinformation-themed parody of 'Supercalifragilisticexpialidocious' from the musical 'Mary Poppins.'"  FAC ¶37.

### C.    Public Reaction

News of the Disinformation Board provoked a firestorm of criticism from both public officials and commentators concerned about government censorship. Even the left-leaning magazine The Nation noted that it "prompted a flood of concern about the impact of such an Orwellian organ on America."  Ex.4 at 1.

The Attorneys General of twenty States warned that the Disinformation Board amounted to the "creation of a board of government censors."  Ex.5, May 5, 2022 Letter from Jason Miyares, Attorney General of Virginia, *et al.*, to the Hon. Alejandro Mayorkas, Secretary of Homeland Security at 3.  They explained that "prescribing orthodoxy by slapping a federal-government label of 'disinformation'" on speech amounted to "McCarthyite speech policing" and that the very "existence of the Disinformation Governance Board will inevitably have a chilling effect on free speech" because of the knowledge that "the government's censors may be watching."  *Id.* at 1, 2.  Similarly, Senators Grassley and Hawley explained that the documents forming the Board "raise concerns that DHS could be seeking an active role in coordinating the censorship of viewpoints that it determines" to be disinformation.  Ex.6 at 4.

Multiple bills were introduced in Congress to defund the Board, including the "Defund the Ministry of Truth Act," which condemned government efforts to "censor dissenting voices." S. 4191, 117th Cong. § 2(2) (2022).

The Electronic Frontier Foundation, Protect Democracy, and the Knight First Amendment Institute warned DHS that any board "monitoring and 'govern[ing]' disinformation is a frightening prospect" and could "be a potent tool for government censorship." Ex.7 at 4.

Media outlets joined the chorus warning about censorship. The Wall Street Journal opined that the Disinformation Board "is potentially a vehicle for all kinds of new rules to stop the left's version of untruths emanating from media and tech firms"—in other words, censorship. Ex.8 at 2. George Washington University law professor Jonathan Turley criticized the Disinformation Board in a blog post entitled "The Sweet Sound of Censorship." Ex.9. The New York Sun ran a column entitled, "Biden's Anti-Disinformation Campaign Raises Specter of Censorship," which explained that "the state putting an imprimatur on 'truth' is dangerous to freedom." Ex.10.

Orwellian comparisons were everywhere. Representative Doug La Malfa said the Disinformation Board "sounds like it's straight out of George Orwell's '1984.'" Ex.11 at 2. *Reason* magazine called it "dystopian," and asserted it would "police the internet." Ex.12 at 1. National Review called it "Biden's Ministry of Truth." Ex.13.

The New York Post called it "dystopian" and "Orwellian." Ex.14 at 2. The ACLU declared that DHS "have themselves to blame for this firestorm … [t]hey announced something with a creepy name and provided no information about the scope or authority of the board." Ex.15 at 7.

Plaintiff was also criticized. Her "cringeworthy" Mary Poppins video was widely mocked.[3] CBS called out her "history of controversial public statements," including her assertion that critical race theory was a "hot button issu[e] that Republicans and other disinformers have seized on"—thus smearing Republicans as disinformers. Ex.16 at 1–2. Others expressed concerns based on her avowed opposition to "free speech absolutists." Ex.17. *Reason* magazine noted her UK testimony supporting legislation she described as "mak[ing] illegal … [content] online where people are being harassed," and said it was "chilling that she … advocates for legislation to constrict speech that, while distasteful, is protected by the First Amendment." *Id.* Professor Turley opined that she "has long been an outspoken anti-free speech advocate" who had "call[ed] for censorship of the right." Ex.9 at 3.

---

[3] *See, e.g.*, *WATCH: Biden's New Disinformation Czar Sings Cringeworthy Mary Poppins Edition About Misinformation*, Mediaite, https://tinyurl.com/yezvhxev (April 29, 2022); *Video: Meet Biden's Cringey 'Disinformation' Czar*, The Washington Free Beacon, https://tinyurl.com/bdhc6thu (April 29, 2022).

Missouri and Louisiana sued the Biden Administration—naming Plaintiff as a defendant—alleging a "campaign of censorship [that] culminated in . . . the creation of a 'Disinformation Governance Board.'" Compl. ¶5, *Missouri v. Biden*, No. 3:22-CV-01213-TAD-KDM (W.D. La. May 5, 2022), ECF No.1; FAC ¶152.

Not surprisingly, Fox opinion hosts joined the raging public debate. They expressed their views that the Disinformation Board's role amounted to "policing information," FAC ¶100, and thus censorship. As one explained, labeling anything "disinformation" necessarily requires "deciding … what is true and what is false … which would, of course, cause them to engage in censorship." *Id.* ¶86. Like others, they mocked Plaintiff for her video, *id.* ¶¶7, 37, 100, 101, 114, and warned that she would become the "official referee of disinformation," *id.* ¶46, and was "going to coordinate with [private parties] … to basically censor things," *id.* ¶95.

Some columnists predicted that Plaintiff would be forced out of her job. *See, e.g.*, Ex.18 at 4. On May 18, 2022, DHS announced that the entire Disinformation Board was being paused, FAC ¶76, and that Plaintiff had resigned, *id.* ¶78.

### D.    Plaintiff's Lawsuit

After Plaintiff sued for defamation on May 10, 2023, Fox moved to dismiss. Plaintiff immediately abandoned her complaint and filed the FAC. Although she cites dozens of statements without specifying which are the subject of her claims, she limits her claims to three *categories* of statements: (1) she "intended to censor

Americans' speech"; (2) she was "fired"; and (3) she "wanted to give verified Twitter users the power to edit others' tweets." *Id.* ¶¶4–6.

### E. The Preliminary Injunction in *Missouri v. Biden*

This summer, the court in *Missouri v. Biden* preliminarily enjoined DHS, finding that the plaintiff States would likely prove that DHS had engaged in illegal censorship precisely by identifying "disinformation" and pressuring "social media companies to suppress protected free speech." *Missouri v. Biden*, No. No. 3:22-CV-01213-TAD-KDM, 2023 WL 4335270, at *53 (W.D. La. July 4, 2023).[4]

## <u>LEGAL STANDARD</u>

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). A plaintiff who seeks to recover "for conduct which is prima facie protected by the First Amendment" must provide "more specific allegations than would otherwise be required." *City of Newark v. Delmarva Power & Light Co.*, 497 F. Supp. 323, 326 (D. Del. 1980) (citation omitted).

---

[4] After the Board was dissolved, Plaintiff was dismissed and the injunction against her denied as moot. *Missouri v. Biden*, 2023 WL 4335270, at *54.

## ARGUMENT

## I. PLAINTIFF FAILS TO STATE A CLAIM FOR DEFAMATION.

This lawsuit is a frontal attack on core protected speech under the First Amendment. In criticizing the Disinformation Board and Plaintiff, and offering predictions and opinions about what the Board and Plaintiff would do, Fox speakers were engaging in a debate on vital matters of public policy. Allowing Plaintiff's lawsuit to proceed would violate the principles that "criticism of government is at the very center of the constitutionally protected area of free discussion," and "[c]riticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

The FAC fails to satisfy multiple elements of a claim. Defamation under New York law[5] requires a "statement of fact"—not an opinion—that is "of and concerning" the plaintiff, that is false, and (where, as here, the plaintiff is a public figure) that is made with actual malice.[6] *Loksen*, 239 F.3d at 265–66. Plaintiff fails to allege facts to satisfy any of these elements.

---

[5] New York law governs. (D.I.18).

[6] Plaintiff agrees that the actual malice standard applies.

## A. Plaintiff Cannot Claim Defamation for Statements About the Disinformation Board, DHS, or the Administration.

Plaintiff's FAC fails first because more than a third of the statements it identifies are not even about Plaintiff. Instead, they address the Disinformation Board, DHS, or the Administration. *See, e.g.*, FAC ¶81 (calling Disinformation Board an "Orwellian government agency"). Such statements are not "of and concerning" Plaintiff and cannot support a claim. Worse, allowing Plaintiff to sue for those statements would eviscerate First Amendment principles protecting criticism of the government.

There can be no action for defaming a government agency. "[N]o court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence." *Sullivan*, 376 U.S. at 291 (internal quotation omitted). And government officials cannot turn criticism of their agencies into actionable defamation of themselves. Permitting such claims would raise "the possibility that a good-faith critic of government will be penalized for his criticism," which would "strik[e] at the very center of the constitutionally protected area of free expression." *Id*. at 292. Accordingly, there "is no legal alchemy" by which government officials can "transmut[e] criticism of government, however impersonal … into personal criticism, and hence potential libel, of the officials of whom the government is composed." *Id.*

A government official claiming defamation must show an attack "specifically directed at the plaintiff," not at the government agency. *Rosenblatt*, 383 U.S. at 81. And to protect free speech, "when the criticism can legitimately be interpreted as criticism of a government entity, rather than a government official, the First Amendment requires adoption of the former interpretation." *Andrews v. Stallings*, 892 P.2d 611, 617 (N.M. Ct. App. 1995); *see also* Laurence H. Tribe, *American Constitutional Law* § 12–12, at 863 (2d ed. 1988) ("[B]ecause critical discussion of government ordinarily involves attacks on individual officials as well as impersonal criticisms of government policy, all defamation claims of aggrieved public officials must be examined closely in order to close what would otherwise be a back door to official censorship.").

Here, statements throughout the FAC relating to the Disinformation Board, DHS, or the Biden Administration cannot be actionable defamation. *See, e.g.*, FAC ¶101 ("BIDEN ADMIN SCRAPPED THE OUTRAGEOUS MINISTRY OF TRUTH, BUT IS STILL TRYING TO CENSOR SPEECH").[7] Nor can Plaintiff turn them into actionable statements by complaining that Fox "consistently impl[ied] that Jankowicz was coterminous with the Board." *Id.* ¶41. Statements about the Board and its authorities are protected criticism of the government and cannot be

---

[7] All statements in Ex.19 should be stricken on this basis.

treated as statements about Plaintiff merely because she believes she was identified with the Board.

### B. Plaintiff's Claims All Fail Because They Attack Statements of Opinion Protected Under the First Amendment.

All of Plaintiff's claims also fail because they challenge statements of opinion protected under the New York Constitution and the First Amendment. "Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Mann v. Abel*, 885 N.E.2d 884, 885–86 (N.Y. 2008); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (First Amendment protects "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" (citation omitted)); *cf. Chau v. Lewis*, 935 F. Supp. 2d 644, 658 (S.D.N.Y. 2013) ("[T]he New York Constitution affords greater protection for statements of opinion than its federal counterpart."). "Distinguishing between fact and opinion is a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean." *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 625 (S.D.N.Y. 2022) (quotation omitted). The "burden rests with the plaintiff to establish that . . . a disputed statement is not protected opinion." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000). The factors courts consider to identify opinions—context, whether the statements are "verifiable, *i.e.*, objectively

capable of proof or disproof," whether they convey a "precise" meaning, and the type of language used, *Sandals Resorts Int'l. Ltd. v. Google, Inc.*, 86 A.D.3d 32, 39–40 (N.Y. App. Div. 2011) (quotation omitted)—all show that the challenged statements would be understood as opinions.

### 1. Context Shows the Statements Were Opinions.

Both the particular context of the Fox programs at issue and the "broader social context," *Steinhilber v. Alphonse*, 501 N.E.2d 550, 554 (N.Y. 1986), show that an ordinary listener would understand the challenged statements as expressions of opinion.

Every challenged statement about Plaintiff appeared on a show dedicated to opinionated commentary or a mix of commentary and news. *See* Ex.20. The hosts included Sean Hannity, Tucker Carlson, Laura Ingraham, and Jesse Watters. *See id.* Viewers of such programs—programs with hosts and guests commenting on or "debating the latest political controversies"—expect "pitched commentary." *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 184 (S.D.N.Y. 2020). The "general tenor" of such shows indicates to a reasonable viewer that hosts and guests may be offering opinions rather than recounting facts, including by engaging in "non-literal commentary." *Id.* at 183. That assessment reflects the common-sense understanding that "[s]ome types of writing or speech by custom or convention

signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984) (*en banc*).

Moreover, the broader social context confirms that viewers would have expected opinions. A public debate was raging about the Disinformation Board. Twenty state Attorneys General charged that it was a "board of government censors," Ex.5 at 3, and two States sued the federal government—and Plaintiff—alleging censorship, *see supra* p. 9. It is well settled that "[s]tatements made in the course of a political debate are … more likely to be understood as opinion." *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1433 (8th Cir. 1989). Viewers would understand that statements made in "politics and public discourse in the United States" are "normally associated" with "rhetorical hyperbole" and vigorous opinions. *McDougal*, 489 F. Supp. 3d at 182–83; *see also Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1017 (1st Cir. 1988) ("In the charged context of a debate over a matter of public concern, the reader will expect a certain amount of hyperbole and loose characterization—in short, a certain amount of opinion.").

And especially in the context of a hot-button issue like the Disinformation Board, one would expect heated debate laden with opinions. Government encroachments on free speech provoke strong opinions, because Americans know that the "right of freely examining public characters and measures, and of free communication among the people thereon" is the "only effectual guardian of every

other right." *Sullivan*, 376 U.S. at 274 (citation omitted). Here, the challenged statements relate to whether Plaintiff would take actions amounting to "policing speech" and censorship, whether Plaintiff's past statements showed a desire to edit others' speech, and ultimately whether Plaintiff had been forced out of her job. Viewers would understand discussion on those subjects—particularly what amounts to government "censorship"—involve less assertions of facts and more pointed commentary, interpretations, warnings, and speculation.

## 2. The Challenged Statements Are Opinions Because They Are Predictions and Assertions About Motives, Intentions, and Future Actions.

The challenged statements are indisputably opinions because, far from asserting concrete facts, they involve assertions about Plaintiff's "intent" and/or predictions about future actions, "which are matters not readily verifiable and intrinsically unsuitable as a foundation for defamation." *Cummings v. City of New York*, No. 19-CV-7723-CM-OTW, 2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020); *see also id.* ("Because statements concerning state of mind, such as hypotheses as to motivation, are not readily verifiable as true or false, courts of this [s]tate have consistently found them to be protected." (quoting *Rappaport v. VV Pub. Corp.*, 163 Misc. 2d 1, 9 (N.Y. Sup. Ct. 1994), *aff'd*, 223 A.D.2d 515 (N.Y. App. Div. 1996))); *Immuno AG. v. Moor-Jankowski*, 549 N.E.2d 129, 134 (N.Y. 1989) (vacated on other grounds) ("Speculations as to the motivations and potential future

consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel."). When such assertions are made about the motives, intentions, or future actions of public officials, moreover, it is essential that they be recognized as protected opinions. "It is vital to our form of government that press and citizens alike be free to discuss and, if they see fit, impugn the motives of public officials." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1305 (8th Cir. 1986) (*en banc*); *accord King v. Globe Newspaper Co.*, 512 N.E.2d 241, 248 (Mass. 1987) ("[T]he First Amendment protects as opinion discussion about the motives of public officials.").

Under these principles, the core statements Plaintiff complains about— namely, (in her paraphrasing) that she "*intended* to censor Americans' speech," that she had the "*desire* . . . to censor Americans' speech," and that she "*wanted* to edit others Twitter user's [sic] posts," FAC ¶¶4, 16, 114 (emphases added)—are assertions about motivations and intentions—or predictions—that are necessarily opinion. Indeed, because the Disinformation Board never got off the ground, *all* statements were couched in terms of what Plaintiff "wants" to do, "intends" to do, "will do," or is "going to" do in the future. *See, e.g.*, *id.* ¶114(a) ("Now Mary Poppins from Hell Nina Jankowicz *wants* to EDIT YOUR TWEETS . . . ." (emphasis added)); *id.* ¶71 ("Let me tell you what Ms. Jankowicz *will do* if she gets power." (emphasis added)); *id.* ¶95 (Plaintiff was "*going to* coordinate with Twitter . . . to

basically censor things" (emphasis added)); *see also id.* ¶¶42, 53, 66, 70–72, 82, 95; Ex.20. Such assertions about officials' *motivations* and *predictions* about future actions are incapable of being proved false and are quintessentially the stuff of political opinion. Indeed, warnings about what officials "will do" if given certain powers are the very lifeblood of political discourse. Because such statements "involv[e] criticism of the motives and intentions of a public official," they are squarely matters of "opinion, protected by the First Amendment." *Janklow*, 788 F.2d at 1305.

### 3. The Challenged Statements Have No Precise Meaning.

The language in the challenged statements also does not convey a "precise meaning," *Steinhilber*, 501 N.E.2d at 554, asserting a particular fact, thus further confirming they are opinions. Plaintiff paraphrases the challenged statements as saying that she "intended to censor" speech. FAC ¶4. But even that is not precise. "Censorship" is the first word Americans use when they feel their free speech is being infringed, and it can cover a variety of actions. As explained below, Plaintiff herself uses the term to include any situation where a person feels pressure to restrict speech. *See infra* p. 23. Thus, saying that Plaintiff would censor speech alone conveys no precise facts. *Cf. Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 915 (Wyo. 1992) (calling plaintiff, *inter alia*, "a censor," was "rhetorical hyperbole" that "cannot, as a matter of law, form the basis for a defamation claim").

More important, it is not Plaintiff's paraphrase that matters, but the actual statements about Plaintiff—which were even less precise. Only a handful used any variation of the word "censor," and they used qualifying language making plain that they offered opinions—or reported someone *else's* opinion. *See, e.g.*, FAC ¶114(b) ("*Critics warn* her new fix to Twitter would make censorship even worse . . . ."); *id.* ¶114(i) ("That, *to me, sounds like a little bit* of censorship."); *id.* ¶95 (Plaintiff "w[as] going to . . . *basically* censor things") (emphases added). All the other statements were even more vague, as they simply described Plaintiff as the "official purveyor of truth," *id.* ¶42, "official referee of disinformation," *id.* ¶46, or "the person that polices our thoughts," *id.* ¶44, and asserted that Plaintiff will "be telling you what's true and what's not," *id.* ¶53, and "deciding what qualifies as the truth," *id.* ¶66. None of those statements has any precise factual meaning. They inherently signal heated opinions in a public policy debate. The same is true of assertions that Plaintiff "wants to edit your tweets." *Id.* ¶114(a).

Lastly, assertions that Plaintiff got "booted," "yank[ed]," or "had to go," *id.* ¶¶122, 123, 124, are also inherently imprecise. They are equally compatible with termination and resignation under pressure and convey that they reflect opinions about the situation that played out as the Disinformation Board imploded.

### 4. The Language Used Demonstrates the Statements Are Opinions.

Finally, the challenged statements and the surrounding commentary are loaded with the sort of "excessive language"—including "rhetorical hyperbole, parody, loose, or figurative" speech, *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 460 (S.D.N.Y. 2012) (internal quotations omitted), and "vigorous epithet," *Milkovich* 497 U.S. at 17—that courts consistently treat as conclusively signaling opinions. *See also Ganske v. Mensch*, 480 F. Supp. 3d 542, 553–54 (S.D.N.Y. 2020) (collecting cases).

Plaintiff challenges statements of obvious rhetorical hyperbole. *See, e.g.*, FAC ¶71 ("She will devour the real truth like it was a light snack."). And parody. *See, e.g.*, *id.* ¶101 ("BIDEN ADMIN WANTED THE MARY POPPINS LADY TO FURTHER FORCE A NANNY STATE ON US[.]"). And loose, figurative speech. *See, e.g.*, *id.* ¶70 ("Nina Jankowicz will come after you"); *id.* ¶122 (Jankowicz "got booted this week"); *id.* ¶123 (DHS "'had to yank' Jankowicz"). And the use of vigorous epithets. *See, e.g.*, *id.* ¶38 ("unhinged" "Minister of Truth"); *id.* ¶39 ("absolutely cartoonish character"); *id.* ¶48 ("far-left radical democrat").

### C. Plaintiff's Claims Fail Because the Challenged Statements Were Substantially True.

If not protected opinions, the challenged statements are still not actionable because allegations in the FAC and matters the Court may judicially notice show the

statements were substantially true. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (substantial truth requires dismissal). In assessing substantial truth, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting of the libelous charge [is] justified.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (internal quotation omitted). Here, the "gist" or "sting" of each challenged category of statements was substantially true.

### 1. Predictions of Censorship Were Substantially True.

Plaintiff claims it was false to say that she would censor speech because the Board had "no ability to censor." FAC ¶9. In Plaintiff's view, "censorship" could occur only if the Board had "operational authority," FAC ¶58, to stop others' speech—such as by deleting it. But that distorts the ordinary usage (and Plaintiff's own usage) of the terms "censor" and "censorship"—especially in the context of heated policy debates defending free speech.

First, as twenty state Attorneys General explained, "prescribing orthodoxy by slapping a federal-government label of 'disinformation'" on speech will, in itself, stifle speech. Ex.5 at 1. The first role assigned to the Disinformation Board in its "charter"—which Plaintiff cites, but conspicuously fails to attach to her FAC—is "identifying" disinformation. Ex.1 at 9. The Attorneys General recognized that the existence of a Board with that role would "inevitably have a chilling effect on free

22

speech" because of the knowledge that "the government's censors may be watching." Ex.5 at 2. They thus concluded that the Board was "a board of government censors." *Id.* at 3. As their letter shows, in common usage, the Board's role in labeling disinformation was in itself enough to qualify as "censorship," because it would create pressure suppressing speech.

Plaintiff herself uses the word "censorship" in a similar way. She has explained that, because women face online harassment in response to posts, before posting, she considers whether "[she] ha[s] the emotional capacity right now to deal with what might come" in response. She calls this pressure "a form of censorship." Ex.2 at 3. If Plaintiff feels censored by online comments, average citizens would surely feel censored by the government labeling their posts "disinformation." That is exactly the point some Fox opinion hosts made: government labeling anything "disinformation" would require government "deciding ... what is true and what is false ... which would, of course, cause them to engage in censorship." FAC ¶86.

Second, the Board's mission also included "coordinat[ing]" "efforts to counter" disinformation, including serving as DHS's "external point of contact for coordination" with "the private sector." Ex.1 at 10–12. As Senators Grassley and Hawley explained, that "raise concerns that DHS could be seeking an active role in coordinating . . . censorship." Ex.6 at 4. Even if the Board did not exert overt pressure on Internet platforms to suppress speech, merely labeling some ideas as

"disinformation" and communicating those labels could suppress speech as platforms responded to the government label. Just like individuals, platform operators could feel pressured and take cues from such labels to suppress speech. *See* Matthew Harwood, *Government attempts to label speech misinformation, disinformation, and malinformation are a free-speech nightmare*, FIRE, https://www.thefire.org/news/government-attempts-label-speech-misinformation-disinformation-and-malinformation-are-free, (November 21, 2022). It was entirely accurate for Fox hosts to warn that such "coordination" with the private sector would result in censorship.

In fact, events have proved that Fox speakers' fears about censorship through "coordination" with the private sector were exactly right—and that DHS does not need "operational authority" to delete speech to engage in censorship. The court in *Missouri v. Biden* held that the plaintiff States were likely to succeed in proving that DHS unlawfully censored speech precisely by identifying so-called disinformation to social media platforms and encouraging them to suppress it. 2023 WL 4335270, at *51–*53. Given that its "charter" made the Disinformation Board DHS's exclusive "external point of contact for coordination with . . . the private sector," Ex.1 at 11, it seems likely that—if the Board had not been dissolved—it would have been the Board engaging in the sort of illegal censorship the court enjoined.

## 2. It Was Substantially True That Plaintiff Was "Booted," "Yank[ed]," or "Fired."

Plaintiff claims it was false to say she was "fired" because, technically, on the same day the Disinformation Board was put on hold (and her job was eliminated), she resigned. FAC ¶¶5, 76–78. But substantial truth does not turn on technicalities. It turns on whether the statement "would have a different effect on the mind of the reader" than the truth. *Masson*, 501 U.S. at 517. Plaintiff pretends that the "truth" here would be a bare statement that she resigned. A more accurate statement for comparison would be something like this: "After a disastrously botched roll-out of a government board that generated a firestorm of criticism, DHS announced today that the entire project was being put on hold (FAC ¶76) and the person in charge resigned (*id.* ¶77)."

Plaintiff cannot plausibly maintain that this is materially better than the shorthand that she got "yanked" or "had to go." *Id.* ¶¶123–24. Such statements would not have a substantially different effect on the listener, because they merely drew an obvious inference. It is common knowledge that the person in charge of a policy failure may resign while being forced out. Here, moreover, it was literally true that Plaintiff "had to go," because the Board was put on hold and her job no longer existed. Whether she was also offered a demoted role as a "policy advisor," *id.* ¶75, is immaterial. Where the distinction between being fired and resigning

would not have a substantially different effect on the listener (such as where there was a dispute between employer and employee), there can be no claim of falsity. *See Patterson v. K&L Distributors, Inc.*, 972 F.2d 1341, at *3 n.5 (9th Cir. 1992) (unpublished) (citing *Fairbanks Pub. Co. v. Pitka*, 445 P.2d 685, 689 (Alaska 1968)); *see also Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 65 (1st Cir. 2015). That principle applies here: when the entire project Plaintiff had been leading had to be stopped, whether Plaintiff resigned or was fired would be an immaterial technicality to the reasonable audience because observers would expect the head of a failed effort to be let go. It would be Orwellian to insist that pundits are prohibited from expressing the view that Plaintiff was "yanked" and instead are required dutifully to recite the official line that Plaintiff "resigned."

### 3. It Is Substantially True that Plaintiff Endorsed Having the Ability to "Edit" Others' Tweets.

Plaintiff last challenges statements that she "wanted to give verified Twitter users the power to edit others' tweets." FAC ¶6. But that is also substantially true.

The FAC quotes an interview in which Plaintiff described a Twitter feature that—in Plaintiff's words—would allow "verified people [to] essentially start to 'edit' Twitter." *Id.* ¶108. The feature allowed users to add context to others' Tweets. *Id.* Plaintiff then endorsed that feature, saying: "I like that. I like the idea of adding more context to claims and tweets and other content online . . . ." *Id.*

Plaintiff complains that Fox hosts shorthanded the point, saying that Plaintiff "wants to edit your tweets." *E.g.*, *id*. ¶114(a). According to Plaintiff, that falsely asserted that she "proposed personally editing others' tweets." *Id.* ¶112. But substantial truth depends on how a reasonable listener would understand the statement in context. *Tannerite Sports, LLC*, 864 F.3d at 250. Reasonable listeners would not understand that to mean that Plaintiff literally wanted to personally edit millions of Fox viewers' Tweets. They would understand that it meant Plaintiff favored having the *ability* to edit Tweets. And that is exactly what she endorsed: "I like that," she said. FAC ¶108.

Finally, to the extent Plaintiff complains about supposed statements that she "proposed" the feature, *id.* ¶112, the actual statements say that she "pitched" the idea, *id.* ¶114(c), (e). But to "pitch" an idea is merely to present and endorse it, and Jankowicz did exactly that: "I like that," she said. *Id.* ¶108.

## D. Plaintiff Fails To Allege Facts Showing Actual Malice.

Plaintiff also fails to meet the "daunting" requirement, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), that she "must allege *facts* to support an inference of actual malice." *Pace v. Baker-White*, 850 F. App'x 827, 831 (3d Cir. 2021); *Biro v. Conde Nast*, 807 F.3d 541, 545–46 (2d Cir. 2015) (*Iqbal* and *Twombly* standards at a minimum apply to pleading actual malice). Plaintiff must plead facts showing that Fox speakers subjectively knew their statements were false

27

or substantially doubted they were true.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020). The FAC fails that test.

*First*, Plaintiff cannot plead actual malice by asserting that there was "readily available information" contradicting the challenged statements, FAC ¶14, and that a "cursory examination," *id.* ¶51, of her past writings or statements would have shown that.  Assertions that someone could have or should have investigated further cannot show actual malice.  Neither "an extreme departure from professional standards" nor "failure to investigate" alone constitutes actual malice.  *McCafferty*, 955 F.3d at 359; *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665, 688 (1989).[8]

In any event, examining Plaintiff's past statements would not have contradicted the Fox speakers.  Others reviewed her record and concluded that she had "call[ed] for censorship of the right," Ex.9 at 3, and that she had "advocate[d] for legislation to constrict speech that, while distasteful, is protected by the First Amendment."  Ex.17.  Contrary to Plaintiff's assumptions, her past statements are subject to differing interpretations—and that further forecloses her flawed theory for showing actual malice.  *See, e.g.*, *Pace*, 850 Fed. App'x at 832.

---

[8] Demands for further investigation of a video of Plaintiff discussing a feature on Twitter, FAC ¶¶111, 113, fail for the same reason—and because the full interview did not contradict Fox speakers' statements anyway.  *See supra* pp. 26–27.

28

*Second*, Plaintiff cannot establish actual malice by pretending that statements from government officials or documents creating the Disinformation Board conclusively established that the Board (and Plaintiff) could not or would not censor speech. *See* FAC ¶¶54–62, 91–94, 97. To begin with, the Board's basic role in identifying disinformation was sufficient in itself to amount to a form of censorship, and nothing officials said could alter that conclusion. Next, assertions from DHS that the Board was purely an "internal working group," *id.* ¶¶56–57, 59, were belied by the Board's charter, which made the Board DHS's "*external* point of contact for coordination with . . . the private sector." Ex.1 at 11 (emphasis added). And assertions that the Board had no "operational authority," FAC ¶¶58, 61, in no way addressed concerns that the Board could effectively encourage suppression of speech in its role "coordinat[ing]" with the private sector—which is exactly how the court found that DHS likely carried out illegal censorship in *Missouri v. Biden.*

More generally, it is well settled that "the press need not accept" denials from the subject of a story, because they "hardly alert the conscientious reporter to the likelihood of error." *Harte-Hanks*, 491 U.S. at 691 n.37. And that rule necessarily applies to denials from the government. *See, e.g.*, *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 53–54 (D.D.C. 2002). If the press were forced to accept every denial from a government official about suspected government misconduct, the press would not be able to fulfill its role to "bare the secrets of government and inform the people."

*N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). Here, moreover, as *Missouri v. Biden* has shown, denials from DHS that it would engage in censorship can be *false.* Indeed, the court found that the very messages from a DHS unit to social media platforms unlawfully seeking suppression of speech included their own disclaimers that DHS was not "demanding censorship." 2023 WL 4335270, at *51.

The documents creating the Disinformation Board also gave no reason for Fox speakers to doubt obvious concerns about censorship. They announce that DHS would identify disinformation and counter it by working with "private sector partners," Ex.1 at 2, and that the Board would coordinate "operational responses," including "coordination with . . . the private sector," Ex.1 at 10–11. That description confirms that the Disinformation Board could "coordinate with Twitter . . . to basically censor things" or "control the speech of Americans." FAC ¶¶95, 97. Indeed, Senators Hawley and Grassley determined that those very documents raised a concern that the Board would be "coordinating the censorship of viewpoints," Ex.6 at 4, and Missouri and Louisiana cited those documents in their lawsuit as evidence of planned censorship, Third Am. Compl. ¶¶286–88, *Missouri v. Biden*, 3:22-cv-01213-TAD-KDM (W.D. La. May 5, 2023), ECF No. 268.

*Third*, allegations of "ugly language" supposedly designed to "denigrate" Plaintiff also do not show actual malice. FAC ¶7. Actual malice is "a term of art

that does not connote ill will or improper motivation," and focuses instead on the defendant's "attitude towards the *truth*, not towards [the plaintiff]." *McCafferty*, 955 F.3d at 360 (internal citations and quotations omitted); *see also Masson*, 501 U.S. at 510–11. Similarly, allegations that Fox was "motivated" by "profit" do not "make out actual malice either." *McCafferty*, 955 F.3d at 361; *cf.* FAC ¶¶8, 19, 118.

*Fourth*, Plaintiff cannot allege actual malice by pointing out that one host said that plaintiff "resigned," FAC ¶120, before later opining that she "got booted" or "yank[ed]," *id.* ¶¶122–23. A person being forced out of a job may be permitted to resign, *see supra* pp. 20, 25–26, and merely reporting at one point that the person "resigned" does not imply recognition that the she was not, in fact, pushed out. Here, the circumstances cried out for the conclusion that Plaintiff was forced out because the entire project she was leading was put on hold. Plaintiff has not remotely alleged facts suggesting that anyone voicing that conclusion acted with actual malice.

*Fifth*, recognizing that her original complaint failed to allege actual malice, Plaintiff has larded the FAC with allegations that Fox speakers acted with actual malice when making statements about an *unrelated* company (Dominion Voting Systems). *See, e.g.*, FAC ¶¶14, 161–85. Those allegations are irrelevant. Plaintiff cannot allege actual malice here by alleging that the facts in a different case show that Fox "is motivated to make false statements," *id.* ¶185, and tacking on a conclusory assertion that Fox acted "consistent with" that approach here, *id.* ¶14; *see*

*also id.* ¶¶168, 172, 176, 185.[9]  Such allegations of "defamatory propensities" are "legally insufficient." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 285 (S.D.N.Y. 2013) (internal quotation omitted); *see also Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) ("actual malice in the abstract" cannot suffice to make a claim because a plaintiff "must demonstrate actual malice *in conjunction* with a false defamatory statement" (emphasis in original)).  Instead, actual malice—which turns on the defendant's "particular, subjective state of mind at the time the statements were made," *Fairfax v. CBS Corporation*, 2 F.4th 286, 295 (4th Cir. 2021) (citation omitted)—requires factual allegations suggesting that those responsible for the statements *in this case* subjectively knew those statements were false or seriously doubted their truth at the time they were made.  Plaintiff fails to allege any such facts.

## II.  CLAIMS BASED ON ANY STATEMENT MADE BEFORE MAY 10, 2022 ARE TIME BARRED.

Plaintiff's claims based on statements made before May 10, 2022 are also time-barred.  Delaware's borrowing statute, *see* Del. Code tit. 10, § 8121, requires applying "whichever is shorter," the Delaware limitations period or "the time limited

---

[9] Paragraphs 14 and 161–85 alleging actual malice in the *Dominion* case cannot remedy Plaintiff's failure to allege actual malice in *this case*.  The allegations are immaterial and impertinent (*i.e.*, they do not pertain to this case) and should be stricken pursuant to Rule 12(f).  *See, e.g.*, *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 617 (E.D. Pa. 2015).

by the law of the state . . . where the cause of action arose." *DuBose v. Wyndham Vacation Resorts, Inc.*, No. 20-1118-CFC, 2021 WL 3145206, at *2 n.1 (D. Del. Jul. 26, 2021).  Whether the action arose in New York (Fox's headquarters and where statements were made), or Virginia (Plaintiff's domicile), the limitations period would be one year, *see* N.Y. C.P.L.R. § 215(3); Va. Code § 8.01-247.1, which is shorter than Delaware's two-year period, *see* Del. Code tit. 10, § 8119.  Thus, a one-year period applies.  Because a defamation claim accrues when the statement is made, *see, e.g.*, *Hotel St. George Assocs. v. Morgenstern*, 819 F. Supp. 310, 318 (S.D.N.Y. 1993), and Plaintiff filed her complaint on May 10, 2023, all claims for statements before May 10, 2022 are barred.  *See* Ex.21 (listing such statements).

## III. THE FAC SHOULD BE DISMISSED UNDER THE HEIGHTENED STANDARD OF NEW YORK'S ANTI-SLAPP STATUTE.

The Court should also apply the heightened standard of New York's Anti-SLAPP law, N.Y. C.P.L.R. § 3211(g)(1), which requires that a claim like Plaintiff's[10] be dismissed unless the complaint establishes a "substantial basis" for it.  In this diversity case, where state substantive law applies, the Court should apply section 3211(g)(1) because its heightened standard provides a substantive protection to defendants by limiting claims for defamation under New York law.

---

[10] Plaintiff's claim is based upon "conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civ. Rights § 76-a(a)(2).

The circuits are split on whether similar heightened standards in anti-SLAPP statutes apply in diversity actions, but the Third Circuit has not addressed the issue.[11] This Court should follow the circuits holding that a heightened standard as in section 3211(g)(1) is not merely a procedural rule that conflicts with Rule 12(b)(6), but rather is "a supplemental and substantive rule to provide added protections … to defendants who are named as parties because of [their] constitutional" free speech activities. *Godin v. Schencks*, 629 F.3d 79, 88 (1st Cir. 2010). Under the test from *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), Rule 12(b)(6) does not answer the same question as a rule like section 3211(g)(1), which is not a general mechanism to test the sufficiency of a complaint, but rather a "mechanism for a defendant to move to dismiss a claim on an entirely different basis," namely, that "the claims in question rest on the defendant's protected" First Amendment activity. *Godin*, 629 F.3d at 89; *accord U.S. ex rel. Newsham v. Lockheed Missiles & Space Co. Inc.*, 190 F.3d 963, 973 (9th Cir. 1999) (applying anti-SLAPP statute); *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 182 (5th Cir. 2009) (same).

Because the FAC fails under Rule 12(b)(6), it follows *a fortiori* that it fails to establish a "substantial basis" for Plaintiff's claims under section 3211(g)(1).

---

[11] Some federal courts have refused to apply section 3211(g). *See, e.g.*, *Carroll v. Trump*, 590 F. Supp. 3d 575, 583 (S.D.N.Y. 2022).

## IV. PLAINTIFF FAILS TO PLEAD ANY FACTS AS TO FOX CORPORATION.

Claims against Fox Corporation must be dismissed for the additional reason that the FAC "does not adequately allege that any Fox Corporation employee played an affirmative role in the publication of the challenged defamatory statements." *Smartmatic USA Corp. v. Fox Corp.,* 213 A.D.3d 512, 513 (N.Y. App. Div. 2023) (dismissing Fox Corporation). Plaintiff pleads *no* facts connecting Fox Corporation employees to the challenged statements. Lumping Fox Corporation and Fox News Network, LLC together as "Fox," *e.g.*, FAC ¶1, is not sufficient, because the two are separate corporate entities. *See Smartmatic*, 213 A.D.3d at 514; *cf.* FAC ¶27 (acknowledging separateness). The "general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries" prohibits simply eliding the distinction between the two. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotations omitted). Nor does Plaintiff allege any facts sufficient to pierce the corporate veil.

Unable to point to any participation by Fox Corporation in the statements about her, Plaintiff resorts to adding citations in the FAC to irrelevant testimony to suggest that Fox Corporation executives had a role in statements about an unrelated corporation (Dominion Voting Systems) in an unrelated lawsuit. *See* FAC ¶¶190–96. Those allegations are irrelevant. Plaintiff points to testimony indicating that, in

November 2020 after the presidential election, one Fox Corporation executive gave "suggestions" concerning the "tone and narrative" of election coverage to the CEO of Fox News, FAC ¶193; Ex.22 115:16-22, and that another executive gave "advice" "from time to time on matters regarding Fox News" in connection with the election because he was "a journalist at heart," FAC ¶194; Ex.23 78:6-23.[12] Even if Fox Corporation executives gave "advice" or "suggestions" about post-election coverage in 2020—the biggest story in the country involving vital issues for the future of the Nation—that does not give rise to any plausible inference about them having any role in statements a year and a half later about a minor DHS official like Plaintiff. Plaintiff cannot simply assert "on information and belief," FAC ¶191, that Fox Corporation executives played the same role in the wholly dissimilar context here.

And Plaintiff's conclusory assertion that "Fox Corporation executives play an active role in news operations and are comfortable publishing false statements," FAC ¶191, is nothing more than an assertion of "defamatory propensities," which is "legally insufficient." *Biro*, 963 F. Supp. at 285 (internal quotation omitted).

---

[12] The FAC quotes snippets of testimony out of context, so the actual testimony is provided here. The FAC also points to testimony that those in the "chain of command" had an obligation to prevent defamatory statements, FAC ¶195, but that described a chain of authority that *ended* with "Suzanne Scott as the CEO [of Fox News]." Ex.24 287:3-5. It did not suggest any involvement by Fox Corporation.

Allowing Plaintiff to proceed against Fox Corporation on these pleadings would be authorizing use of "discovery as a fishing expedition . . . to seek out the facts necessary to establish a legally adequate complaint." *White v. Hon Co.*, 520 F. App'x 93, 95 (3d Cir. 2013).

## **CONCLUSION**

The FAC should be dismissed with prejudice.

Respectfully submitted,

**DLA PIPER LLP (US)**

**OF COUNSEL:**

Eric M. George (*pro hac vice*)
Patrick F. Philbin (*pro hac vice*)
Katherine A. Petti (*pro hac vice*)

**ELLIS GEORGE CIPOLLONE
O'BRIEN LLP**
2121 Avenue of the Stars, Suite 3000
Los Angeles, California 90067
(310) 274-7100
(310) 275-5697 (Fax)

1155 F Street, NW, Suite 750
Washington, DC 20004
(202) 249-6900
(202) 249-6899 (Fax)

egeorge@egcfirm.com
pphilbin@egcfirm.com
kpetti@egcfirm.com

August 31, 2023

*/s/ John L. Reed*
John L. Reed (I.D. No. 3023)
Peter Kyle (I.D. No. 5918)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone (302) 468-5700
Facsimile (302) 394-2341
john.reed@us.dlapiper.com
peter.kyle@us.dlapiper.com

*Attorneys for Fox News Network, LLC,
and Fox Corporation*

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

The undersigned counsel certifies that this filing complies with the type, font, and word limitations set forth in the Court's Standing Order of November 10, 2022, as modified by the Court's Order dated August 23, 2023 in this case. According to the word processing system used to prepare it, the foregoing document contains 8,488 words, excluding the case caption, table of contents, table of authorities, and signature block. The text of this document, including footnotes, was prepared in Times New Roman, 14 point.

    /s/ John L. Reed
John L. Reed (DE Bar No. 3023)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
(302) 468-5700
(302) 394-2341 (Fax)
john.reed@us.dlapiper.com