IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NINA JANKOWICZ, | |
| Plaintiff, | |
| v. | Civil Action No. 23-513-CFC |
| FOX NEWS NETWORK, LLC, and FOX CORPORATION, | |
| Defendants. | |

## MEMORANDUM

The sole count of the 93-page First Amended Complaint (the Complaint) filed by Plaintiff Nina Jankowicz accuses Defendants Fox News Network, LLC, and Fox Corporation (collectively, Fox) of defamation under New York law. D.I. 26 ¶¶ 197–208; D.I. 18 at 1. According to the Complaint, Jankowicz is "an internationally recognized expert in disinformation" who served as the Executive Director of the now-defunct Disinformation Governance Board (the Board) housed within the Department of Homeland Security (DHS). D.I. 26 ¶ 21. "DHS announced the formation of the Board and the appointment of Jankowicz as [its] Executive Director" on April 27, 2022. D.I. 26 ¶ 34. Jankowicz resigned from her position on May 18, 2022. D.I. 26 ¶ 22. That same day, "DHS officials announced that the Board was being 'paused.'" D.I. 26 ¶ 76. The Board "was

ultimately dissolved" in August 2022. D.I. 26 ¶ 74; *Following HSAC, Recommendation, DHS terminates Disinformation Governance Board*, U.S. DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/news/2022/08/24/following-hsac-recommendation-dhs-terminates-disinformation-governance-board [https://perma.cc/GGN6-RSD7] (Aug. 24, 2022).

The Complaint alleges that Jankowicz resigned from the Board's Executive Director position "as a result of Fox's false statements and the ensuing harassment." D.I. 26 ¶ 22. In the Complaint's words:

> Fox made three categories of repeated false claims about Jankowicz. First, over the course of over a year, Fox built a narrative calculated to lead consumers to believe that Jankowicz intended to censor Americans' speech. Anyone consuming Fox starting in April 2022 understood that Fox was telling them that Jankowicz and the Board were out to censor them and that they should be afraid of her.
>
> Second, Fox hosts, guests, and/or commentators said that Jankowicz was fired from DHS. In fact, as Fox knew, Jankowicz had resigned due to harassment arising from Fox's defamation.
>
> Third, Fox hosts, guests, and/or commentators said that Jankowicz wanted to give verified Twitter users the power to edit others' tweets. They relied extensively on an obviously manipulated video—the full version of which was publicly available—to transform her description (and indeed, skepticism) of a developing beta feature on Twitter into a false declaration that she would supposedly police online speech on the platform.

D.I. 26 ¶¶ 4–6.

Pending before me is Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim. D.I. 29.

## I.

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. Planco Fin.*, 542 F.3d 59, 64 (3d Cir. 2008). The court may consider only the allegations in the complaint and the documents incorporated into the complaint by reference and matters of which the court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

To state a claim upon which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). It must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Deciding whether a

claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

Notwithstanding the title of its motion and the fact that Fox cites *Iqbal* in the section of its brief titled "Legal Standard," *see* D.I. 30 at 10, Fox argues on pages 33–34 of its Opening Brief that in resolving its motion, I "should also apply the heightened standard of New York's Anti-SLAPP law, N.Y. C.P.L.R. § 3211(g)(1), which requires that a claim like Plaintiff's be dismissed unless the complaint establishes a 'substantial basis' for it." D.I. 30 at 33. Fox, however, never discusses how this standard requires dismissal of the Complaint other than to say that "[b]ecause the [Complaint] fails under Rule 12(b)(6), it follows *a fortiori* that [the Complaint] fails to establish a 'substantial basis' for Plaintiffs claims under section 3211(g)(1)." D.I. 30 at 34. Accordingly, Fox has waived its right to argue that even if the Complaint satisfied Rule 12(b)(6)'s requirements it should be dismissed under the heightened "substantial basis" standard. And for that reason, I need not and do not address whether § 3211(g)(1) would apply in this case. I need only determine whether the Complaint's claim for defamation under New York law satisfies the requirements of Rule 12(b)(6).

To prevail on a defamation claim under New York law, the plaintiff must establish five elements: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory

4

statement, and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). If the plaintiff is a public figure the plaintiff must also prove that the alleged defamatory statement "was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173–74 (2d Cir. 2001) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). It is undisputed that Jankowicz is a public figure. *See* D.I. 32 at 28.

## II.

Fox argues first that Jankowicz's defamation claim should be dismissed insofar as it is based on 37 alleged statements in the Complaint that "are not even about" Jankowicz but "[i]nstead . . . address the Disinformation Board, DHS, or the Administration." D.I. 30 at 12. Fox specifically identifies the 37 challenged statements in its briefing. *See* D.I. 31-19 at 2–10. In response to this argument, Jankowicz says that "[m]any of Fox's statements about the Board were about Jankowicz," and that "Jankowicz has identified statements concerning the Board that defame her in context and by implication." D.I. 32 at 13. Jankowicz, however, identifies only one such statement: a statement alleged in paragraph 100 of the Complaint to have been made by Fox host Sean Hannity in November 2022. Accordingly, I will dismiss the Complaint insofar as Jankowicz's defamation claim

5

is based on the other 36 challenged statements, as it is not disputed that those statements are not "of and concerning the plaintiff." *Palin*, 940 F.3d at 809.

With respect to the remaining statement, the Complaint alleges in paragraph 100 that Jankowicz's image was used during [a] segment" of a show when Hannity stated that "the Board was a 'department . . . dedicated to working with the special media giants for the purpose of policing information.'" D.I. 26 ¶ 100 (ellipses in the original). Jankowicz says that "[i]t is plausible that viewers understood th[is] statement[] to be about Jankowicz." D.I. 32 at 14. But even if that were the case, the statement is not defamatory because it is not false. On the contrary, according to the Disinformation Governance Board's own charter, the "[p]urpose" of the Board was to "guide and support the [DHS's] efforts to address mis-, dis-, and mal-information that threatens homeland security ('MDM')," D.I. 31-1 at 10, and the "focus" of the Board was

> on the following four cross-functional lines of effort to counter MDM, many of which are already underway ('lines of effort'): (1) identifying MDM ('Identification'); (2) assessing and analyzing the risk that such MDM poses to homeland security ('Risk Assessment'); (3) responding to these MDM threats ('Response'); and (4) building resilience to MDM ('Building Resilience').

D.I. 31-1 at 10. The charter—which Jankowicz says in her briefing is "the most reliable information source as to the Board and Jankowicz's powers and limits," D.I. 32 at 6 n.2—further provided that the Board was to "serv[e] as [DHS's]

6

internal and external point of contact for coordination with . . . the private sector[] and non-governmental actors regarding MDM." D.I. 31-1 at 12. In other words, the Board was formed precisely to police information and to work with non-governmental actors (such as "media giants") to accomplish that purpose. *See Police*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/police [https://perma.cc/496M-SFN4] (July 15, 2024) (defining "police" as "one attempting to regulate or censor a specified field or activity"); *id.* (defining "police" as "to control, regulate, or keep in order by use of police").

Jankowicz insists in her briefing that "[t]hrough media appearances, public remarks, and testimony under oath, current and former officials made clear that the Board had no operational authority and no role in speaking with social media companies." D.I. 32 at 17. But whatever Jankowicz may mean or the "current and former" officials may have meant by the phrase "operational authority," the Board's charter expressly provided that the Board would "coordinate[], deconflict[], and harmonize[]" the "operational responses" undertaken by DHS's "[c]omponents." *See* D.I. 31-1 at 10 ("Whereas [DHS] Components will lead on operational responses to MDM in their relevant mission spaces, the Board will ensure DHS efforts are coordinated, deconflicted, and harmonized, both within DHS and across the interagency, to ensure efficiency, unity of effort, and

7

promotion of applicable compliance and best practices."). And, as noted above, the charter also expressly provided that the Board would "serv[e] as [DHS's] internal and external point of contact for coordination with . . . the private sector[] and non-governmental actors regarding MDM." D.I. 31-1 at 12.

Accordingly, since the alleged defamatory statement in paragraph 100 of the Complaint is not false, I will also dismiss Jankowicz's defamation claim insofar as it is based on that statement. *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34 (N.Y. App. Div. 2014) ("Because the falsity of the statement is an element of [a] defamation claim, the statement's truth or substantial truth is an absolute defense.") (citation omitted).

### III.

Fox next argues that I should dismiss Jankowicz's defamation claim because the alleged defamatory statements in the Complaint are statements of opinion that cannot support a defamation claim as a matter of law. D.I. 30 at 14. Jankowicz acknowledges that "[o]pinions 'are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation.'" D.I. 32 at 14 (citing *Mann v. Abel*, 885 N.E.2d 884, 885–86 (N.Y. 2008)). But she says that the alleged defamatory statements in the Complaint are factual and not opinions. D.I. 32 at 13.

"Distinguishing between fact and opinion is a question of law for the court[], to be decided based on what the average person hearing or reading the communication would take it to mean." *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 625 (S.D.N.Y. 2022) (quotation omitted). In making that determination, the court should consider three factors: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] readers or listeners that what is being read or heard is likely to be opinion, not fact." *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995) (internal quotation marks and citations omitted).

### A.

The three factors individually and considered together show that the alleged defamatory statements that fall within Jankowicz's first "category"—described by Jankowicz as statements "calculated to lead consumers to believe that Jankowicz intended to censor Americans' speech," D.I. 26 ¶ 4—are opinion. First, the language used in these challenged statements lacks readily understood precise meaning. "To censor" can mean various things, including "to scrutinize and revise, to suppress or edit selectively." BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE 153 (4th ed. 2016). Censorship can also be understood as the actual

9

removal of text or video from the public realm. *See Censor*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/censor [https://perma.cc/B8FM-6LVY] (June 26, 2024) (defining "censor" in relevant part to mean "delete anything considered objectionable"). Jankowicz impliedly adopts this definition of censorship with her repeated assertions in the Complaint and her briefing that the Board lacked "operational authority." But censorship can also be understood to encompass efforts to restrain or suppress certain kinds of speech. *See id.* (defining "censor" in relevant part to mean "to examine in order to suppress"). "To suppress" means not only "to stop or prohibit the publication or revelation of" but also "to restrain" and "to inhibit." *See Suppress*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/suppress [https://perma.cc/3UCN-LZPJ] (July 13, 2024). For many if not most American citizens, the identification of their speech as "misinformation," "disinformation," or "malinformation" by a government entity authorized to "coordinat[e]" with "the private sector" "regarding" that labeling would be viewed as an effort to discourage people from engaging in that speech. *See* D.I. 31-1 at 12. Jankowicz herself seems to concede as much in her briefing. *See* D.I. 32 at 27 (Jankowicz responding "[p]erhaps" to "Fox['s] claim[] [that] 'average citizens would surely feel censored by the government labeling their posts "disinformation."'").

10

Second, the challenged statements are not readily capable of being proven true or false because, to use Jankowicz's words, the statements were "calculated to lead consumers to believe that Jankowicz *intended* to censor Americans' speech." D.I. 26 ¶ 4 (emphasis added). "[S]ubjective evaluations of intent and state of mind . . . are matters not readily verifiable and intrinsically unsuitable as a foundation for defamation" under New York law. *Cummings v. City of New York*, 2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020). Predictions about what Jankowicz would do in the future, *see, e.g.*, D.I. 26 ¶ 72 (alleging that guest on Fox show stated that Jankowicz was "going to actually be taking things off [of the internet]") (brackets in the original), are similarly not readily verifiable statements that are actionable under New York's libel laws. *See Immuno AG. v. Moor-Jankowski*, 549 N.E.2d 129, 134 (1989) ("Speculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel."), *vacated on other grounds by Immuno v. Moor-Jankowski*, 497 U.S. 1021 (1990). Jankowicz says that "referring to [her] as a 'censor' or the 'Minister of Truth,' implies verifiable facts." D.I. 32 at 18. But she does not identify those facts, and neither "censor" nor "Minister of Truth" makes apparent what those facts could be.

The third factor also favors characterizing the challenged statements as opinion. The challenged statements were made on shows dedicated to opinionated

11

commentary or a mix of commentary and the news. *See* D.I. 31-20. But more importantly, the broader context in which the challenged statements were made confirms that viewers would likely have understood the challenged statements to be opinion. It is undisputed that from the time its existence was announced by DHS, the Disinformation Governance Board was a hypercharged subject of political debate. Within two weeks of the announcement, twenty state Attorneys General called upon DHS's Secretary to disband the Board. In a public letter addressed to the Secretary, the Attorneys General stated that "[t]he Disinformation Governance Board, by its very existence, and almost certainly by design, threatens to 'enforce silence' when Americans wish to express views disfavored by the Administration." D.I. 31-5 at 5. On the same day that letter was published, two states sued the Biden Administration to prevent the implementation of what they described as a "campaign of censorship [that] culminated in . . . the creation of a 'Disinformation Governance Board." *Missouri v. Biden*, No. 22-1213 (W.D. La.), D.I. 1 ¶ 5; *see also* No. 23-513 (D. Del.), D.I. 26 ¶ 152. "In the charged context of a debate over a matter of public concern, the [viewer] will expect a certain amount of hyperbole and loose characterization—in short, a certain amount of opinion." *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1017 (1st Cir. 1988).

In sum, considering all three factors, and especially the first two, the alleged defamatory statements regarding Jankowicz's intent to censor Americans' speech

12

are statements of opinion and therefore not actionable as defamation under New York law. Accordingly, I will dismiss Jankowicz's defamation claim insofar as it is based on such statements.

B.

The parties' briefing with respect to whether Jankowicz's second category of alleged defamatory statements are opinion is wanting. Neither party bothered even to identify the universe of allegations in the Complaint that a Fox employee or agent stated that Jankowicz "was fired from DHS." (Based on my own review of the Complaint, it appears that there are five alleged defamatory statements that could fall within this category, *see* D.I. 26 ¶¶ 120, 122–124.) Fox specifically addresses in its briefing three alleged statements that fall in this category—that Jankowicz "got booted" from her position as Executive Director (alleged in paragraph 122 of the Complaint), that DHS's secretary "had to yank" Jankowicz from her job (alleged in paragraph 123 of the Complaint), and that "Jankowicz was so absurd that she had to go away" (alleged in paragraph 124 of the Complaint). D.I. 30 at 20. Fox argues that these statements are "inherently imprecise" and "reflect opinions about the situation that played out as the Disinformation Board imploded." D.I. 30 at 20. Jankowicz does not dispute this contention in her briefing. Accordingly, I will dismiss her defamation claim insofar as it is based on these three alleged statements.

13

C.

Fox argues, and I agree, that Jankowicz's third category of alleged defamatory statements—i.e., statements "that Jankowicz wanted to give verified Twitter users the power to edit others' tweets," D.I. 26 ¶ 6—are assertions about Jankowicz's motivations and intentions that are not actionable under New York defamation law. *See Cummings*, 2020 WL 882335, at *22 ("[S]ubjective evaluations of intent and state of mind . . . are matters not readily verifiable and intrinsically unsuitable as a foundation for defamation" under New York law.). Accordingly, I will dismiss Jankowicz's defamation claim insofar as it is based on such statements.

IV.

Fox next argues that even if the alleged defamatory statements it challenges were not protected opinions, they are still not actionable under New York defamation law because they are substantially true. D.I. 30 at 21.

"Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint . . . must plead facts that, if proven, would establish that the defendant's statements were not substantially true." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017). "[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would

14

have produced." *Id.* at 242 (internal quotation marks and citation omitted) (alteration in the original).

Fox contends, and I agree, that Jankowicz has not pleaded facts from which it could plausibly be inferred that the challenged statements regarding intended censorship by Jankowicz are not substantially true. On the contrary, as noted above, censorship is commonly understood to encompass efforts to scrutinize and examine speech in order to suppress certain communications. The Disinformation Governance Board was formed precisely to examine citizens' speech and, in coordination with the private sector, identify "misinformation," "disinformation," and "malinformation." D.I. 31-1 at 10. For the reasons discussed above, that objective is fairly characterized as a form of censorship.

The alleged statements to the effect that Jankowicz had been fired are similarly not sufficiently pleaded as not substantially true. According to the Complaint, on May 17, 2022, "after Jankowicz had drafted a resignation letter, DHS officials offered Jankowicz the opportunity to stay on with the agency as a policy advisor while the Board's future was under review," D.I. 26 ¶ 75. The next day, "DHS officials announced that the Board was being 'paused,'" D.I. 26 ¶ 76, and Jankowicz "chose to officially resign from the Board," D.I. 26 ¶ 77. Saying that DHS officials fired or dismissed Jankowicz from her position as the Board's Executive Director while the Board was put on pause so that DHS could determine

15

the Board's future would not cause a different effect in the mind of a viewer than saying that DHS officials offered Jankowicz "the opportunity to stay on" in a lesser position while the Board's future was under review. Being offered the opportunity to stay on as a mere "policy advisor" is tantamount to being demoted or dismissed from the position of Executive Director. Being dismissed from a position is fairly described as being fired from that position. *See Fire*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/fire [https://perma.cc/E7YN-2ED3] (July 18, 2024) (defining "to fire" as "to dismiss *from a position*") (emphasis added). Jankowicz faults Fox because, in her words, "Fox knew [she] had resigned when DHS would have continued to employ her." D.I. 32. But she alleges in the Complaint that she did not submit her resignation until the day after DHS officials told her DHS would continue to employer *in a lesser position*. Moreover, given that Jankowicz "chose to officially resign" from her position as Executive Director on the same day that DHS publicly announced that the Board was being "paused," whether she resigned or was fired as the leader of the Board would have amounted to an immaterial technicality to the ears of a reasonable viewer because such a viewer would have expected the dismissal of the person in charge of an enterprise that had been "paused" and whose very future was in question.

Finally, the alleged defamatory statements that Jankowicz wanted to give verified Twitter users the power to edits others' tweets also are not plausibly pleaded as not substantially true. To the contrary, the Complaint itself quotes Jankowicz confirming in a Zoom session that she endorsed the notion of having "verified" individuals edit the content of others' tweets. Specifically, the Complaint alleges that Jankowicz stated "during a Zoom meeting" that she "like[d] the idea" of "verified people" "edit[ing]" Twitter and that she "like[d] the idea of adding more context to claims and tweets and other content online, rather than removing it." D.I. 26 ¶ 108.

Accordingly, regardless of whether the challenged defamatory statements are opinion, they cannot support Jankowicz's defamation claim because the Complaint does not plausibly allege that they are not substantially true.

V.

Fox also argues that I should dismiss the Complaint because it fails to plausibly allege that the Fox speakers who made the alleged defamatory statements did so with actual malice and fails to plead any facts with respect to Fox Corporation. But since the result of my rulings above is the dismissal of

17

Jankowicz's claim in its entirety, I need not and do not address those arguments.

7.22.24
Date

COLM F. CONNOLLY
CHIEF JUDGE